1
2

**WO**

3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

9
10

Theresa Watson and Thomas Watson, wife
and husband, Arizona residents,

No. CV-14-08228-PCT-NVW

11

Plaintiffs,

**ORDER**

12

v.

13
14

Yavapai County, a political subdivision of
the State of Arizona,

15

Defendant.

16
17
18
19

Before the Court is Defendant's Motion for Summary Judgment (Doc. 47) and the parties' accompanying statements of facts and briefs.  For the reasons that follow, the Motion will be granted.

20

**I.      INTRODUCTION**

21
22
23

Theresa Watson has suffered from back and neck pain since a 2004 car accident. During her employment with Yavapai County ("the County"), this pain required her to take frequent breaks at work or sometimes stay home altogether.

24
25
26
27
28

In February 2013, Watson's boss assigned her to a different position in an effort to meet a looming deadline.  In March 2013, Watson's pain drastically increased.  Conflict arose between Watson and her boss.  Watson requested more breaks and time off, and she frequently complained to her boss and Human Resources.  Watson's boss met with her,

reorganized her break schedule, and admonished her negative attitude.  In May 2013, Watson was fired.

Watson claims the County discriminated against her because of (1) her disability under the Americans with Disabilities Act ("ADA"), (2) her ADA-protected activity, (3) her use of leave under the Family and Medical Leave Act ("FMLA"), and (4) her FMLA-protected activity.

The County seeks summary judgment on all these claims.  In the County's view, Watson's disability was accommodated to the extent her doctor instructed, and Watson was fired for discourtesy and insubordination.

## II.    LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant has the burden of showing the absence of genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion.  The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial" and may not rest upon the pleadings. *Anderson*, 477 U.S. at 256.  To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## III.    MATERIAL FACTS

The following facts are drawn from the County's Statement of Facts (Doc. 48) and Watson's Statement of Facts (Doc. 52), though they are presented in a sequence different from that of either party's Statement.  Unless otherwise indicated, these facts are undisputed.  All evidence is viewed in the light most favorable to Watson.

### A.    Watson's employment and doctor's notes before 2013

In 2000, Watson was hired as a clerk in the Yavapai County Assessor's Office ("the Office").  In 2004, she injured her back and neck in a car accident.  She has experienced episodes of pain ever since.

In 2005, Watson visited Dr. Terry Bagley to address her pain.  Dr. Bagley prescribed daily stretching exercises and medication.  (Doc. 48-3 at 44.)  He also certified that Watson "may need 2–3 days per month off of work."  (Doc. 48-4 at 2.)

In 2007, Dr. Bagley prescribed work restrictions for Watson, including "no sitting > 1½ – 2 hours at a time" and "frequent stretch breaks (15 min. every 2 hours)."  (Doc. 48-5 at 63.)  These restrictions were "permanent."  (*Id.*)

In 2009, Pam Pearsall took office as the elected County Assessor.  Watson's job at that time required her to answer phone calls from angry customers.  Watson asked to be relieved from constantly answering phones.  In response, Pearsall created a new position combining customer service with other duties.  In this new position, Watson continued to complain, and Watson's supervisor reported her negative attitude to Pearsall.

That same year, Dr. Bagley certified Watson's possible need for "2–3 days" of work leave every "1–2 months." (Doc. 48-5 at 56.) He re-certified this work leave in 2010, 2011, and 2012. (Doc. 48-4 at 12, 19; Doc. 52-2 at 23–24.)

In 2010, Pearsall assigned Watson to a "floater" position, designed to assist different departments in the Office as needed. Watson's new supervisor, Tina Bourdon, received reports from other employees about Watson's negative comments and reported Watson's negative attitude to Pearsall.

That same year, Dr. Bagley prescribed updated work restrictions for Watson, including "frequent stretch breaks (few minutes every hr.)." (Doc. 48-4 at 15.)

In 2011, Watson asked to work from home. At Bourdon's suggestion, Pearsall approved a work-from-home arrangement in which Watson needed to come in to the office only one day per week.

In December 2012, Pearsall offered Watson a new position in the Office's Business and Personal Property section ("the Property section"). Watson declined, in part because the position would require her to come in to the office more often. Pearsall then offered the position to someone else, who accepted.

**B.      Watson's return to working in the office, failure to attend a workshop, and 30-hour suspension**

In early 2013, the Property section supervisor, Karen Parker, asked Pearsall for additional personnel to help the section meet a deadline. Accordingly, Pearsall assigned Watson to the Property section for her one day of in-office work per week. Parker then asked Pearsall for more of Watson's time. Accordingly, on February 7, Pearsall changed Watson's work-from-home arrangement to require her to come in to the office two days per week, to help the Property section. (Doc. 48-2 at 26.)

On February 12, the Department of Revenue held a workshop in Phoenix regarding property tax issues. Members of the Property section were invited. Watson

- 4 -

told Parker she would like to attend, and Pearsall approved Watson's attendance. However, Watson did not attend.

Upon learning of Watson's absence, Pearsall interviewed Watson and her co-workers. She concluded that Watson deliberately skipped the workshop because she was angry about having to come in to the office an additional day each week. In response, on February 25 Pearsall rescinded the work-from-home arrangement entirely, and on February 28 she decided to suspend Watson for 30 hours without pay. (Doc. 48-2 at 34, 36.) Pearsall gave Watson a "Notice of Intent" to suspend her, along with a "Statement of Facts" in support of suspension. (*Id.* at 36–42.) According to the statement, Watson "demonstrated insubordination towards several supervisors when she refused to attend an assigned workshop." (*Id.* at 39.) The statement also noted that Watson had recently made "negative comments" to co-workers about her work assignment, her supervisor's decisions, and one of her co-workers. (*Id.*)

### C. Watson's increased FMLA leave, complaint to Human Resources, and meetings with her boss

In March 2013, Watson's back pain drastically increased. She took a week of FMLA leave starting March 3. During that week she visited Dr. Bagley. Dr. Bagley wrote a note stating that Watson "may need several days off per week at her discretion," to be "re-evaluated in 30 days." (Doc. 48-4 at 25.) Upon receiving this note, the Office's Human Resources department amended Watson's FMLA status, noting her "leave circumstances have changed considerably." (Doc. 52-2 at 26.)

On March 9, Watson wrote a fourteen-paragraph letter to the Office's Human Resources director, Alan Vigneron.[1] (Doc. 48-3 at 15–16.) The letter purports to be a "continuation" of Watson's "first formal complaint dated June 8, 2009." (*Id.* at 15.) The letter complains about a multitude of perceived wrongs, most of which are not unlawful.

---

[1] Watson states that she did not write any letters "while on the clock." (Doc. 52-1 at 8.) The Court assumes this is true for purposes of the present motion.

- 5 -

For example, the letter claims that the Office has created a "hostile work environment pursuant to Yavapai County policy," has engaged in "a pattern of harassment against [Watson], due to a personality conflict," has written comments about Watson based on old information that "has been proven to be false," has held Watson "to a different standard then [sic] other employees in the office, due to a personality conflict," has demonstrated "hostility towards any employee who questions or rebuts any statements or policies," and has disciplined Watson based on "false accusations" and incomplete "research." (*Id.*)  The letter also claims that Watson was well-regarded under the Office's 2005 administration, but that in 2007 she was viewed as "the worst employee" because she criticized the Office's new procedures for business and personal property. (*Id.*)  The letter further claims that Pearsall falsely accused Watson of writing about an article in the newspaper, retaliated against Watson for asking why she was assigned to the Property section, and created a "toxic work environment" by hiring family and friends. (*Id.* at 15–16.)  Only after making all these claims does the letter refer to unlawful activity: namely, that Pearsall threatened to demote Watson "due to [her] having an ADA, which [Pearsall] stated made other employees more valuable." (*Id.* at 16.)

On March 14, Vigneron showed Watson's letter to Pearsall.  That same day, Pearsall emailed Vigneron asking whether Watson has an ADA accommodation, "to make sure we don't violate any accommodation that we are suppose [sic] to be providing her." (Doc. 52-2 at 34.)  Vigneron replied that Watson had an accommodation as of 2008 and that they "need to go through the interactive process again." (*Id.*)

On March 18, Pearsall contacted Watson to schedule daily meetings with her.

On March 22 through March 25, Watson took four more days of FMLA leave.

On March 26, Watson's daily meetings with Pearsall began.  According to Watson, these meetings were spent discussing her requests for accommodations and work restrictions, and the meetings also gave Pearsall an idea of how often Watson used FMLA leave. (Doc. 52, ¶¶ 31, 33, 36, 56.)

**D.**   **Watson's continued FMLA leave, additional complaint to Human Resources, verbal warning from her boss, and revised break schedule**

On March 26, Parker asked Pearsall to assign even more personnel to the Property section.  Parker explained that her staff "is now overloaded and desperately needs consistent help to meet [their June 3] deadline." (Doc. 52-2 at 38.)  Accordingly, Pearsall assigned Watson to spend her entire work week helping the Property section, and she assigned another employee to spend four days a week in the section as well.  (*Id.*)  Pearsall asked Parker to report how many days both employees work at the section each week, "with absences." (*Id.*)  Pearsall later testified that when Watson was absent "the work didn't get done as quickly." (Doc. 52-1 at 50.)

Watson took two more days of FMLA leave on March 28 and 29, then three more days of FMLA leave on April 3 through April 5, and then another week of FMLA leave starting April 22.

On April 24, while Watson was on leave, she visited Dr. Bagley.  As with her last visit, Dr. Bagley wrote a note stating that Watson "may need several days off per week at her discretion," to be "re-evaluated in 30 days at her discretion." (Doc. 48-4 at 29.)  He also prescribed updated work restrictions, including "no sitting > 1.5 – 2 hrs @ time" and "frequent stretch breaks." (*Id.* at 31.)

On April 29, during Watson's daily scheduled meeting with Pearsall, Watson said her back had been hurting and that she needs to get up and stretch more often.  (Doc. 52-1 at 19.)  Pearsall proposed dividing Watson's two 15-minute breaks per day into six 5-minute breaks, as had been done for other employees. (*Id.*)  Watson said she also tries to stretch for a few minutes when she goes to the bathroom every hour or so. (*Id.*)  Pearsall said she would write a revised break schedule for Watson by their next meeting. (*Id.*)

Later that day, Watson returned to Pearsall's office. (*Id.* at 20.)  She told Pearsall the two 15-minute breaks are helpful and that she can also stretch when she goes to the bathroom. (*Id.*)  Pearsall replied that employees go to the bathroom on their breaks and lunch only. (*Id.*)  Watson insisted she sees employees go to the bathroom all day long.

(*Id.*)  Pearsall said she would ask Human Resources about it and that they need to do whatever makes Watson more productive.  (*Id.*)  After that conversation, Watson asked two Office supervisors whether their bathroom use was restricted.

On April 30, shortly before Watson's daily meeting with Pearsall, Watson entered Pearsall's office and handed her a typewritten letter.  (Doc. 52-1 at 22.)  The letter claims that Pearsall has created "a hostile work environment" and accuses Pearsall of "attempting to change [Watson's] breaks to six 5 minute breaks, in order to manipulate [her] use of the bathroom, except for on lunch or breaks."  (*Id.*)  The letter also states that the daily meetings "serve no purpose" other than to "belittle" Watson and bait her "into a conflict."  (*Id.*)  As an example of the "hostile work environment," the letter explains that Pearsall criticized Watson's productivity one day but then complimented her the next day, indicating Pearsall's opinion changes "from day to day."  (*Id.*)  The letter concludes by demanding that Human Resources issue "a statement stating [Watson's] breaks are restored or all employees in the [Office] are no longer to take breaks."  (*Id.*)  The bottom of the letter clarifies that it is "a formal complaint."  (*Id.*)  After handing this letter to Pearsall, Watson left Pearsall's office and delivered a copy to Vigneron.  (*See* Doc. 52-3 at 5.)

Later that day, Pearsall gave Watson a verbal warning for using work time to ask co-workers about their bathroom use and for having a "negative attitude."  (Doc. 48-2 at 44–45.)  Pearsall also gave Watson a new break schedule, which allowed six 5-minute breaks each day instead of two 15-minute breaks.  (*Id.* at 44.)

### E.    Watson's further FMLA leave, further discipline, further complaints to Human Resources, and further revised break schedule

On May 1, Pearsall gave Watson a "Final Written Warning" in response to her behavior the previous day, namely, handing Pearsall the typewritten letter and refusing to participate in the daily meetings.  (Doc. 48-2 at 47–50.)  The warning describes this

behavior as "defiant and insubordinate." (*Id.* at 48.) The warning also admonishes Watson for making personal calls during work time. (*Id.*)

Later that day, Watson typed a five-page "official response" to the warning. (Doc. 52-3 at 5–9.) The response is addressed to Pearsall and Vigneron. (*Id.* at 5.) It denies that Watson refused to participate in the daily meetings, denies that Watson made any personal calls, and invokes Watson's "right to respond to any and all allegations in writing." (*Id.* at 5, 7, 9.) It claims, among other things, that the new break schedule deprives Watson of "needed physical activity to relieve [her] pain & stress." (*Id.* at 6.) It also challenges Pearsall's authority to change the break schedule on the grounds that Pearsall is not a doctor: "But as to my break schedule, Pam [Pearsall] you are not a doctor and my doctor and I have discussed what meets my needs and a treatment program." (*Id.*) The bottom of the response clarifies that it is part of Watson's "hostile work complaint" against Pearsall. (*Id.* at 9.)

On May 2 and May 3, Watson took two more days of FMLA leave.

On May 6 (Monday), Pearsall gave Watson an unscheduled performance evaluation. (Doc. 48-2 at 55–56.) Watson was marked "Below Standard" in eighteen of twenty-five categories. (*Id.* at 55.) In the "Summary of Performance" section, Pearsall wrote:

> Theresa is often unpleasant when dealing with others. Theresa analysis [sic] conversations and situations and then misinterprets them, the misconstrued situation festers in Theresa's mind then she writes a note in response, the note is typically accusatory in nature and often demanding some sort of relief, next Theresa will deliver said note to the Assessor, supervisor or human resources. Theresa also spreads her misunderstood events to coworkers thus creating negative work environments all around her. Theresa does not interact in a professional and courteous manner at all times with coworkers or the assessor. Theresa does not readily accept responsibility for her inappropriate behavior. Theresa is currently an "at risk" employee due to her poor performance in the work place.

(*Id.*)  By way of comparison, Watson's previous evaluation on October 1, 2012 marked her "Below Standard" in only one category.  (Doc. 52-3 at 19.)  In the "Summary of Performance" section of that evaluation, Watson's supervisor wrote only that "Theresa continues to work from home and is able to meet production goals."  (*Id.*)

On May 7 (Tuesday), Watson typed a five-page "official response" to Pearsall's evaluation.  (Doc. 52-1 at 26–30.)  The response is addressed to Pearsall and Vigneron.  (*Id.* at 26.)  It vehemently disagrees with the evaluation and requests supporting documentation.  (*Id.* at 26–30.)  It claims, among other things, that Pearsall told other employees to "spy" on Watson.  (*Id.* at 26, 30.)  The bottom of the response invokes Watson's "rights to respond in writing to any written statements" and clarifies that it is a "continuation" of Watson's "formal hostile work [sic]."  (*Id.* at 30.)

That same day, Watson gave Pearsall and Human Resources a letter stating that "the work conditions could cause [her] to resign," due to "harassment" which is "detrimental to [her] health."  (Doc. 52-3 at 33.)

Also on that day, Watson asked Parker to verify, in writing, that Watson's productivity levels were satisfactory.  (Doc. 52-3 at 22.)  Parker declined and emailed Pearsall about the conversation.  (*Id.*)  Pearsall then instructed Watson to "refrain from making demands of Supervisors" because such behavior is inappropriate and decreases productivity.  (Doc. 52-3 at 35.)

Also on that day, Watson called Dr. Bagley and asked for a note prescribing longer, less frequent work breaks.  Accordingly, Dr. Bagley faxed the Office a note stating "Pt feels longer less frequent stretch breaks are more beneficial than several short breaks.  Please comply at her discretion."  (Doc. 48-4 at 33.)

On May 8 (Wednesday), during Watson's daily meeting with Pearsall, Watson took handwritten notes and asked Pearsall to slow down so that she could write everything Pearsall said.  Pearsall told Watson to stop taking notes during the daily meetings.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On May 9 (Thursday), during the daily meeting, Watson resumed taking notes as soon as Pearsall began speaking.  Pearsall gave Watson a verbal warning for (1) taking notes during meetings instead of engaging in conversation, (2) arriving at work an hour and a half earlier than scheduled, (3) using several minutes of work time to document a conversation with Human Resources, (4) printing 128 pages from the Office printer for personal use without paying the required $0.10 per page, and (5) asking Pearsall to sign a daily meeting attendance log.  (Doc. 48-2 at 65–68.)  Pearsall also proposed a new break schedule, according to which Watson could take time out of her lunch break and use that time for longer breaks throughout the day.

Later that day, Watson gave Pearsall and Vigneron a typed letter responding to the newly proposed break schedule.  (Doc. 52-1 at 32.)  The letter states that the County should comply with Dr. Bagley's May 7 note, which prescribes a longer break "at [Watson's] discretion."  (*Id.*)  The letter further states that lunch "should not be broken up into sections" and there is "no justification" for removing Watson's breaks.  (*Id.*)  The bottom of the letter includes a "formal notice" that Watson is experiencing a "hostile work environment."  (*Id.*)

On May 10 (Friday), Watson took another day of FMLA leave.

On May 13 (Monday), during the daily meeting, Pearsall told Watson she would work to develop a reasonable break schedule.

That same day, Watson gave Pearsall and Vigneron another typed letter about the break schedule.  (Doc. 52-1 at 36.)  The letter accuses Pearsall of failing to follow Dr. Bagley's instructions that "it is at patients [sic] discretion as to what is needed."  (*Id.*) The letter also states that if Watson's bathroom use is limited to breaks and lunch, she will "soil" herself.  (*Id.*)  The letter concludes: "I want to clearly state to you Pam [Pearsall]; I find your behavior to be totally unprofessional."  (*Id.*)  The bottom of the letter includes a "formal notice" that Watson is experiencing a "hostile work environment."  (*Id.*)

On May 14 (Tuesday), during the daily meeting, Pearsall asked Watson which of Dr. Bagley's notes applied: the April 24 note (requiring "no sitting > 1.5 – 2 hrs @ time" and "frequent stretch breaks") or the May 7 note (requiring "longer less frequent stretch breaks"). (Doc. 52-1 at 38–39.) Watson said they both apply but Watson has discretion as to which one is more beneficial at any given time. (*Id.* at 39.) Pearsall pointed out that Watson said she needs to use the bathroom every hour or two. (*Id.*) Watson responded that Pearsall's comments about her bathroom use were "unprofessional." (*Id.*) Pearsall replied that Watson's statement to other employees—that Pearsall is forcing her to wear Depends—was unprofessional. (*Id.*) Watson protested that she did not use those words and that what she actually said was "I guess I'll have to wear Depends because I cannot wait that long to use the bathroom." (*Id.*) Watson also clarified that she made that statement to only one employee, not "employees." (*Id.*) Pearsall said she would talk to Human Resources. (*Id.*)

Later that day, Pearsall gave Watson a further revised break schedule. (Doc. 48-2 at 73.) Under the new schedule, Watson would still have six 5-minute breaks each day, but her lunch would be reduced from 60 minutes to 30 minutes, and the remaining 30 minutes would be "flex" time to be used at her discretion throughout the day as long as she informs her supervisor and clocks out when she uses it. (*Id.*)

### F.      Watson's termination

On May 14, after Pearsall distributed the further revised break schedule, she received a typed letter from Watson responding to Pearsall's May 9 verbal warning. (Doc. 52-1 at 34.)[2] The letter (1) states that Watson never "demanded" anything from a supervisor, (2) defends Watson's use of the Office printer on the ground that she was printing health insurance documents, and (3) defends Watson's note taking on the ground

---

[2] The letter is dated May 9 but stamped as received by Human Resources on May 14. (Doc. 52-1 at 34.) Watson does not dispute that Pearsall received the letter after distributing the further revised break schedule. (Doc. 54, ¶ 109.)

that she has short-term memory problems.  (*Id.*)  The bottom of the letter includes a "formal notice" that Watson is experiencing a "hostile work environment."  (*Id.*)

At that point, Pearsall decided to fire Watson, and she spoke with Vigneron and the County's attorney to begin the termination process.  Later that day, Watson was suspended "pending the outcome of an internal investigation."  (Doc. 52-3 at 49.)

On May 15, Watson delivered a typed letter to Pearsall and Vigneron criticizing the further revised break schedule.  (Doc. 52-1 at 41.)  The letter accuses Pearsall of continuing to disregard Dr. Bagley's instructions that "it is at patients [sic] discretion as to what is needed."  (*Id.*)  The letter also points out that under Office policy, employees "may" be given two 15-minute paid breaks.  (*Id.*; *see also* Doc. 52-2 at 63.)  The bottom of the letter includes a "formal notice" that Watson is experiencing a "hostile work environment."  (Doc. 52-1 at 41.)

On May 16, the Office gave Watson a "Notice of Intent" to terminate her, along with a "Statement of Facts" in support of termination.  (Doc. 48-2 at 77–81.)  The statement concluded that Watson was "insubordinate," displayed a "negative attitude," made "unwarranted demands," and failed to "appropriately respond to reasonable directives."  (*Id.* at 81.)  The notice required Watson to attend a "Pre-Action Meeting," where she "may respond to the Statement of Facts verbally or in writing."  (*Id.* at 77.)

Watson was given four or five days' notice to attend the June 4 pre-action meeting.  She told Vigneron she could not attend because her husband was having chemotherapy treatments.  She asked for FMLA leave or paid time off for the date of the pre-action meeting, but Pearsall denied her requests.  At the pre-action meeting, the Office's statement of facts was accepted without Watson's input or objection.

Watson appealed her suspension and termination to the Yavapai County Employees' Merit System Commission.  After hearing testimony and argument from Watson and the County, the Commission concluded that the suspension and termination were "not arbitrary or capricious."  (Doc. 48-3 at 18, 30–31.)

Watson was also denied unemployment benefits.  She appealed this decision to the Arizona Department of Economic Security.  At the initial hearing, Watson testified and presented documents before a judge.  The judge ruled that Watson was not entitled to unemployment compensation because she was fired for "misconduct."  The Appeals Board affirmed.  (Doc. 48-3 at 33–40.)

Watson brought this action on November 25, 2014.  (Doc. 1.)

## IV.    ANALYSIS

Watson pleads claims under the ADA and the FMLA.

### A.    ADA

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual" and prohibits retaliating against an individual who "has opposed any act or practice made unlawful by [the ADA]."  42 U.S.C. §§ 12112(a), 12203(a).

Watson claims the County (1) discriminated against her because of her disability and (2) retaliated against her because she opposed a practice made unlawful by the ADA.

#### 1.    Discrimination

Under the ADA, discrimination includes not only the unequal treatment of a disabled employee but also a failure to make "reasonable accommodations" for that employee.  42 U.S.C. §§ 12112(b)(4), (b)(5)(A).  Once an employer becomes aware of an employee's need for accommodation, it must engage in an "interactive process" with the employee to identify and implement reasonable accommodations.  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).

Watson claims the County discriminated against her by (1) "failing to engage in the interactive process in good faith," (2) "failing to grant her an accommodation" that was "reasonable," and (3) "taking tangible personnel actions against her including termination."  (Doc. 51 at 16.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

None of these claims survives summary judgment. First, Watson offers no evidence that the County failed to engage in the interactive process in good faith; if anything, the evidence shows the opposite. When Pearsall saw Watson's March 9, 2013 letter to Human Resources, she asked Vigneron whether Watson had any accommodations. He replied that Watson had an accommodation as of 2008 and recommended going through the interactive process again. This recommendation made sense in light of the changes in Watson's doctor's notes since 2008. Pearsall then scheduled daily meetings with Watson. By Watson's own admission, these meetings were spent discussing Watson's requests for accommodations and work restrictions.

Second, Watson offers no evidence that the County failed to grant her a reasonable accommodation. Watson criticizes the revisions to her break schedule, but reasonable accommodations may include "modified work schedules." 42 U.S.C. § 12111(9)(B). Here, both of the revised break schedules were in compliance with Watson's doctor's notes. In 2007 Watson's doctor prescribed stretch breaks for "15 min. every 2 hours," but in 2010 he prescribed breaks for a "few minutes every hr.," and his April 2013 prescription did not specify a time period. Thus, giving Watson five-minute breaks every hour, rather than two fifteen-minute breaks every day, simply followed doctor's orders. In May 2013 Watson's doctor prescribed "longer less frequent stretch breaks" at her "discretion." Thus, reducing Watson's lunch to give her thirty extra minutes of break time, usable at her discretion, also followed doctor's orders.

Watson says she never asked for these specific revisions to her break schedule, but an "employer is not obligated to provide an employee the accommodation he requests or prefers." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citation omitted). Rather, the employer "need only provide some reasonable accommodation." *Id.* (citation omitted). Whether a particular accommodation is reasonable turns on the facts of the case. *McAlindin v. Cty. of San Diego*, 192 F.3d 1226, 1238 (9th Cir. 1999). Here, the undisputed facts show that the County reasonably

accommodated Watson's needs as defined by her doctor.  Watson has not presented evidence that further accommodations were necessary or appropriate.

Third, Watson offers no evidence that the County's "tangible personnel actions against her including termination" were because of her disability.  *See Humphrey*, 239 F.3d at 1139 ("Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability.").  In her briefing, Watson does not identify any causal connection between her disability and her termination; indeed, she appears to rest her ADA discrimination claim entirely on the alleged failure to accommodate.  (*See* Doc. 51 at 16–17.)  Admittedly, in Watson's March 2013 letter to Human Resources, she stated that Pearsall threatened to demote her "due to [her] having an ADA."  But that freestanding statement is not evidence that any of the County's actual actions against Watson were due to her disability.  The record does not indicate when this alleged threat was made, whether it materialized, or how it connects to any action taken by the County.  Moreover, the County has offered several nondiscriminatory reasons for its actions against Watson, and Watson's vague statement in her March 2013 letter does not raise a genuine issue of material fact that these reasons were pretextual.  *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001) (finding plaintiff's evidence of disability discrimination sufficient for prima facie case but insufficient to raise triable issue of pretext).  Summary judgment will be granted as to Watson's ADA discrimination claims.

### 2.    Retaliation

Watson may claim retaliation under the ADA even though she did not suffer disability discrimination.  This is because, under the ADA anti-retaliation clause, employees have a right to oppose practices they "reasonably believe" are illegal, even if they turn out to be mistaken.  *See E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1005 (9th Cir. 2002).

However, it is well-settled that "disruptive or unreasonable protests . . . cannot support a retaliation claim." *Matima v. Celli*, 228 F.3d 68, 79–80 (2d Cir. 2000) (citing cases from the First, Fourth, Eighth, Ninth, Tenth, and D.C. Circuits). Employee protests are protected from retaliation only if they are "reasonable in view of the employer's interest in maintaining a harmonious and efficient operation." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)). This reasonableness requirement serves a practical purpose. Without such a requirement, employees could insult or harass their employer with impunity, as long as they purport to do so in "protest" to some unlawful practice.

To withstand summary judgment, Watson must make a prima facie case that she would not have been disciplined or fired "but for" her reasonable protests. *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004) (requiring prima facie case); *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015) (requiring but-for causation). Moreover, because the County has offered legitimate reasons for disciplining and firing Watson, Watson must also demonstrate a triable issue of fact as to whether these reasons are pretextual. *Pardi*, 389 F.3d at 849.

The Court assumes without deciding that Watson has made a prima facie case. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (taking this approach with respect to age discrimination claim). But Watson has not sufficiently demonstrated pretext, for several reasons.

First, Watson was disciplined for misconduct *before* she began her protests. In February 2013, Pearsall decided to suspend Watson for deliberately skipping a work-related event. Three days after the decision, Watson took a week off from work. During this week she wrote a lengthy letter criticizing Pearsall, and over the next few months she wrote several similar letters. The timing of Watson's letters suggests that her discipline caused her protests, not the other way around. At the very least, the fact that Watson was disciplined for good reason before her protests indicates that her subsequent discipline

was also for good reason.  *Cf. Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (an employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

Second, Watson's conduct *between* her protests warranted discipline.  After Watson wrote her initial letter criticizing Pearsall, she continued to act unprofessionally. She interrupted supervisors during work hours with questions irrelevant to the task at hand, such as questions about their bathroom use and a request to verify her productivity in writing.  She transcribed her daily meetings with Pearsall instead of engaging in conversation.  She used the Office printer for personal use without paying for it, and she continued to refuse after being instructed to pay.  She was combative during daily meetings; indeed, on May 14 she told Pearsall that her comments about bathroom use were "unprofessional," even though the comments directly pertained to how to accommodate Watson's needs.  In Watson's final performance evaluation, Pearsall noted that Watson "is often unpleasant when dealing with others" and "does not interact in a professional and courteous manner at all times with coworkers or the assessor."  These were permissible reasons to discipline Watson.

Watson has not presented evidence that these reasons were a pretext for unlawful retaliation.  She claims she was disciplined for talking to supervisors, but in fact the problem was that she interrupted supervisors during work hours.  She claims she was disciplined for taking notes in meetings with Pearsall, but in fact the problem was that she transcribed instead of engaging in conversation.  She claims her meetings with Pearsall served no purpose, but she admits that the meetings were spent discussing her accommodations and work restrictions.  She claims she was fired for defending her use of the Office printer, but that was only one of many reasons she was fired, and it was a legitimate reason because it showed Watson's refusal to comply with a direct order to follow a valid Office policy.  To the extent Watson attacks the objective validity of Pearsall's reasons for disciplining her, her attack misses the mark.  The focus of the

pretext inquiry is whether the employer "honestly believed its reason for its actions," not whether the reason is "foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)). Watson has provided no evidence that Pearsall did not believe the reasons she gave for discipline and termination.

Third, Watson's conduct *within* her protests warranted discipline. The content of Watson's letters was a mix of (1) opposition to practices she deemed unlawful under federal law, (2) opposition to practices she deemed unfair or unlawful under state law, (3) criticism of Pearsall without any legal basis, and (4) refusal to accept responsibility for her misconduct. The first category—opposition to practices prohibited by federal law— might be protected under the ADA, depending on whether Watson "reasonably believed" the practices were unlawful. The Court assumes for present purposes that such opposition was protected. But the second category—opposition to practices prohibited by state law—is not protected under the ADA. And the third and fourth categories— criticism of Pearsall and refusal to accept responsibility—are not protected because they are not "reasonable in view of the employer's interest in maintaining a harmonious and efficient operation." *O'Day*, 79 F.3d at 763.

Watson has not presented evidence that she was disciplined for the protected parts of her letters, as opposed to the unprotected parts. In fact, the evidence shows the opposite. When Pearsall wrote Watson's final performance evaluation, she referred to unprofessionalism in Watson's letters—namely, her tendency to be "accusatory" and "demanding," her failure to "interact in a professional and courteous manner," and her failure to "readily accept responsibility" for misconduct:

> . . . Theresa [Watson] analysis [sic] conversations and situations and then misinterprets them, the misconstrued situation festers in Theresa's mind then she writes a note in response, the note is typically accusatory in nature and often demanding some sort of relief, next Theresa will deliver said note to the Assessor, supervisor or human resources. Theresa also spreads her misunderstood events to coworkers thus creating negative work

environments all around her.  Theresa does not interact in a professional and courteous manner at all times with coworkers or the assessor.  Theresa does not readily accept responsibility for her inappropriate behavior. . . .

This unprofessionalism was apparent in Watson's letters as well as her day-to-day interactions.  It became increasingly apparent in the weeks leading up to Watson's termination.  For example, Watson's May 1 letter was a five-page critique of a warning she had received for insubordination.  Among other things, the letter challenged Pearsall's authority to change Watson's break schedule on the grounds that Pearsall is not a doctor.  Similarly, Watson's May 7 letter was a five-page critique of her poor performance evaluation.  Among other things, the letter accused Pearsall of spying on her.  Watson's May 13 letter came the day before Pearsall decided to fire her.  The letter criticized Pearsall personally: "I want to clearly state to you Pam [Pearsall]; I find your behavior to be totally unprofessional."  Watson's May 14 letter, like previous ones, offered excuses for Watson's misconduct rather than accepting any responsibility.  Overall, Watson's letters were disrespectful and combative, much like her oral communication with Pearsall.  The fact that Watson was fired after writing these letters does not suggest pretext for unlawful retaliation.

To sum up: Watson was disciplined for misconduct before she engaged in any protected activity, and she continued her misconduct until she was fired.  She has provided no evidence that the reasons offered by the County were pretext for unlawful retaliation.  On this record, taken as a whole, no reasonable juror would find that the real "but for" cause of Watson's discipline and termination was the ADA-protected aspects of her opposition activity.  Summary judgment will be granted as to Watson's ADA retaliation claim.

**B.    FMLA**

The FMLA gives employees the right to take leave for protected reasons and the right to return to their job after taking such leave, and it prohibits employers from interfering with the exercise or attempted exercise of these rights.  29 U.S.C. §§ 2612(a),

2614(a), 2615(a)(1).  As a result, "employers cannot use the taking of FMLA leave as a negative factor in employment actions."  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (quoting 29 C.F.R. § 825.220(c) (alteration and emphasis omitted)).  The FMLA also prohibits employers from retaliating against employees for "opposing any practice made unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(2); *Bachelder*, 259 F.3d at 1125 n.11.

Watson claims the County (1) interfered with her FMLA rights by considering her taking of FMLA leave as a negative factor in deciding to discipline and fire her and (2) retaliated against her because she opposed a practice made unlawful by the FMLA.

### 1.    Interference

Watson's FMLA interference claim will survive summary judgment only if there is a triable issue of fact as to whether her taking of FMLA leave was impermissibly considered as a factor in her discipline or termination.  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003).  To demonstrate this, Watson can use direct or circumstantial evidence, or both.  *Bachelder*, 259 F.3d at 1125.

The evidence here does not support an inference that Watson was disciplined or fired for taking FMLA leave.  Before March 2013, Watson took periodic leave for eight years.  She was never disciplined for taking this leave.  In February 2013, Watson was suspended for deliberately skipping a work-related event.  It is undisputed that the suspension was not motivated by Watson's use of leave.

In March 2013, Watson significantly increased her FMLA leave, and she was fired more than two months later.  There is no evidence that Watson was prevented or discouraged from taking leave during this time.  Moreover, the temporal proximity between Watson's increase in leave and termination does not suggest causation.  As explained in Part IV.A.2 *supra*, the fact that Watson was disciplined for good reason before March 2013 indicates that her subsequent discipline was also for good reason.  Also, as detailed in Part IV.A.2 *supra*, the record is replete with instances of Watson's

unprofessional conduct leading up to her termination.  This unprofessional conduct was the source of Pearsall's growing dissatisfaction with Watson, as evidenced by the Final Written Warning and the unscheduled performance evaluation.  Pearsall finally decided to fire Watson in May 2013.

These circumstances—where an employee takes FMLA leave for years without consequence, then is suspended for misconduct, then increases her FMLA leave while continuing to engage in misconduct, and then is fired—do not raise a triable issue of FMLA interference.  Otherwise, any bad employee who suspects she will be fired could simply increase her FMLA leave, forcing the employer to either keep her or face trial.  "The FMLA does not impose this Hobson's choice."  *Fleming v. IASIS Healthcare Corp.*, ___ F. Supp. ____, 2015 WL 9302301, at *9 (D. Ariz. Dec. 22, 2015).

Watson purports to offer evidence that she was disciplined and fired for taking leave, but this evidence is illusory.  First, Watson claims that her frequent leave impeded the County's ability to meet an important deadline, so she was fired.  (Doc. 51 at 4–5.)  But the deadline was on June 3, and her termination was not finalized until at least June 4.  The fact that the County retained Watson past the deadline is, if anything, evidence that her leave did *not* motivate the termination decision.

Second, Watson quotes Pearsall as saying that "work didn't get done as quickly" when Watson was absent.  (Doc. 51 at 5.)  But Pearsall made this statement in response to a direct question in a deposition: "Do you know how the work got done in [Watson's] absence?"  (Doc. 52-1 at 50.)  Pearsall's answer is a statement of the obvious, not evidence of what motivated her to fire Watson.

Third, Watson claims that one of her supervisors, Tina Bourdon, testified that she supported Watson's termination in part because of Watson's absences.  (Doc. 51 at 5.)  But it is not clear why Bourdon's opinion matters, since according to Watson, the termination decision was made by Pearsall, Vigneron, and the County's attorney.  (Doc. 52, ¶ 124.)  Moreover, Watson's description of Bourdon's testimony is incomplete.  At

the deposition, Bourdon initially testified that she supported Watson's termination because of "insubordination of not following instructions" and the fact that "work being done in the office was not up to productivity standards." (Doc. 52-1 at 68.) Counsel then asked whether productivity was low "because [Watson] wasn't in the office doing the work?" (*Id.*) Bourdon replied: "I would say not being there was part of it but then when she was in the office the production wasn't being met either." (*Id.*) Thus, Bourdon regarded Watson as unproductive generally, not unproductive due specifically to FMLA leave.

Fourth, Watson points out that Pearsall received daily reports on her productivity, including absences, and that the scheduled daily meetings gave Pearsall an idea of how often Watson was absent. (Doc. 51 at 5.) But neither of these facts suggests improper motive. Pearsall kept tabs on the productivity of both workers that she transferred to the Property section, not just Watson. Pearsall's knowledge of Watson's absences is not evidence of FMLA interference any more than her knowledge of Watson's sex is evidence of Title VII discrimination.

At oral argument, Watson argued that her unscheduled performance evaluation shows that she was fired for taking leave. But the evaluation says nothing about taking leave except a performance category of "Schedules time off in advance," for which Watson was marked "Meets Standard." (Doc. 52-3 at 16.) Further, the evaluation's "Summary of Performance" section describes Watson as negative, unprofessional, discourteous, and unwilling to accept responsibility for her behavior, all of which are amply supported by the record.

In sum, given the lack of evidence that Watson was disciplined or fired for taking leave and the wealth of evidence to the contrary, no reasonable juror would find that the County impermissibly considered Watson's taking of FMLA leave as a factor in her discipline or termination. Summary judgment will be granted as to Watson's FMLA interference claim.

1

2. **Retaliation**

2        Although undecided in the Ninth Circuit, other circuits that have considered how

3  an employee can establish an FMLA retaliation claim have adopted some version of the

4  burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792

5  (1973).  *See Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (collecting

6  cases).

7        Regardless of the framework used, Watson has not presented evidence that the

8  County retaliated against her for opposing an unlawful practice under the FMLA.  The

9  only FMLA practice she opposed was the denial of her FMLA leave for the pre-action

10  meeting leading up to her termination.  (Doc. 51 at 11–12.)  But the County denied

11  Watson leave only after Pearsall had decided to fire her.  (*See id.*)  Watson cannot claim

12  that her opposition to a post-termination-decision act caused her termination.  *See Clark*

13  *Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (an employer "proceeding along

14  lines previously contemplated, though not yet definitively determined, is no evidence

15  whatever of causality").  Summary judgment will be granted as to Watson's FMLA

16  retaliation claim.

17

18        IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment

19  (Doc. 47) is granted in full.

20        IT IS FURTHER ORDERED that the Clerk shall enter judgment in favor of

21  Defendant and against Plaintiff.  The Clerk shall terminate this case.

22        Dated this 29th day of June, 2016.

23

24        _____

25                Neil V. Wake
         United States District Judge

26

27

28